RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0206p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 18-1672

*v.*

CALVIN EARL MCREYNOLDS, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 1:16-cr-20677-15—Thomas L. Ludington, District Judge.

Decided and Filed: July 9, 2020

Before: DAUGHTREY, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:** Margaret Sind Raben, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant. Timothy M. Turkelson, UNITED STATES ATTORNEY'S OFFICE, Bay City, Michigan, for Appellee.

CLAY, J., delivered the opinion of the court in which DAUGHTREY, J., joined, and GRIFFIN, J., joined in part. GRIFFIN, J. (pp. 20–25), delivered a separate opinion concurring in part and dissenting in part.

—————————

**OPINION**

—————————

CLAY, Circuit Judge. Defendant Calvin McReynolds appeals his conviction and sentence for conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  For the reasons that follow, we affirm McReynolds' conviction but vacate his sentence and remand for resentencing.

**BACKGROUND**

In April 2017, a grand jury indicted McReynolds and seventeen codefendants for various violations of the federal drug laws.  McReynolds was charged only in Count 1 with conspiring to distribute and to possess with intent to distribute 500 grams or more of cocaine and 1,000 grams or more of heroin.  The indictment provided that between June 5, 2015 and August 30, 2016, the defendants

> knowingly conspired and agreed together and with other persons, both known and unknown to the grand jury, to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).  The conspiracy as a whole involved 500 grams or more of a mixture or substance containing a detectable amount of cocaine, . . . and 1000 grams or more of a mixture or substance containing a detectable amount of heroin, . . . all of which is attributable to each defendant as a result of their own individual conduct, and the conduct of other conspirators reasonably foreseeable to each of them. . . . All in violation of Title 21, United States Code, Section 846.

(Indictment, R. 183, Pg. ID 973–74.)

McReynolds was the only defendant to proceed to trial.  At trial, he conceded that he does in fact sell drugs for individual consumption, but argued that he was not a member of the charged conspiracy. The prosecution presented various circumstantial evidence to link McReynolds to the conspiracy.

First, the prosecution introduced the testimony of Special Agent Mitchell King.  King was part of the joint federal and state task force investigating the conspiracy.  King testified that the task force initiated approximately fifty controlled buys during its investigation, but that none

of these buys were from McReynolds.  The task force also obtained Title III wiretaps of the phones of identified drug sellers and the conspiracy's leader, Damarlin Beavers.  The sixty-one-page application for the Title III wiretaps included the names of nine suspects in the conspiracy, but again not McReynolds.  According to King, from the wiretap of Beavers' phone, the task force found that McReynolds was making contact with Beavers "about every four days" to buy drugs. (Trial Tr., R. 570, Pg. ID 3878.)  McReynolds frequently bought a split (*i.e.*, half an ounce) and sometimes one ounce from Beavers.  Of the 2,297 pertinent calls intercepted on Beavers' phone during the sixty days of the wiretap, only fifty-eight calls were between Beavers and McReynolds.

On August 30, 2016, the task force executed eight search warrants at locations on Grant Street, S. Warren Avenue, Joy Street, Mackinaw Road, Welland Drive, 13 Mile Road, and two other locations in Saginaw, Michigan.  These locations included the stash house and home of Derek Duane Riley, the conspiracy's supplier, and the home of Beavers, the conspiracy's leader.  Riley and Beavers acknowledged the amounts seized from these locations in their plea agreements.  (*See* No. 1:16-cr-20677-TLL-PTM-2 (Riley), R. 105; No. 1:16-cr-20677-TLL-PTM-1 (Beavers), R. 449.)  While mentioning each of the other codefendants, Riley's and Beavers' plea agreements did not mention McReynolds.

None of the eight searches returned any evidence associated with McReynolds.  His name was not included on any of the ledgers or logs obtained, his fingerprints were not on any of the seized evidence, and law enforcement did not include his name as a suspect on any of the lab reports associated with the searches.  In addition, law enforcement chose not to search McReynolds' home.  Agent King testified that a pole camera at the Grant Street address showed McReynolds outside of that location on one occasion (the camera had been installed for months).

The prosecution next introduced testimony of cooperating witness and codefendant Brandon Pratt.  Pratt testified that he had not been close to McReynolds since 2013 or 2014.  He said that McReynolds "like[d] to do his own thing . . . hang around different people." (Trial Tr., R. 571, Pg. ID 3994.)  He said that McReynolds bought and sold drugs, and that Pratt had seen McReynolds at the Grant Street address once or twice but did not know if McReynolds stored drugs there.  On cross examination, he admitted that he never saw McReynolds bring drugs or

take any drugs from the Grant Street location. Pratt testified that McReynolds sometimes cooperated with codefendants to sell drugs and share resources, and was an active member of the conspiracy.

The prosecution's main witness was confidential informant, A.A., who self-identified at trial as a former buyer and a recovering heroin and crack cocaine addict. She said that she last used controlled substances 363 days before her testimony. A.A. testified to several occasions in which she had purchased heroin and crack cocaine from McReynolds. She testified that she usually purchased these drugs in small amounts (approximately 0.3 grams) for individual consumption.

A.A. testified that on one occasion she was directed to a house at Cleveland and Porter streets to buy heroin from McReynolds. While there, "Smurf," a codefendant, arrived with a bag of drugs that A.A. testified had about six bricks of heroin and six bricks of crack cocaine. A.A. said that, on another occasion, she saw McReynolds and Smurf bagging drugs for individual sales.

A.A. had nine convictions for shoplifting and a felony theft of a credit card. After serving time for her convictions, she contacted Detective Barry Gatza to become an informant and make controlled buys. Gatza was present in the courtroom while she was testifying in McReynolds' trial and was mentioned in her testimony. During a recess, a juror asked the trial court if Gatza would be testifying, but the trial court informed him that Gatza would not testify. After trial resumed, A.A. testified that she had a probation violation hearing the day before giving her testimony. She said that Gatza had driven her to her probation violation hearing the day before and had gone into "a room" at the courthouse with the judge. She testified that Gatza had spoken to her state judge and she was now off probation. She denied that Gatza's help had affected her testimony. After additional testimony presenting circumstantial evidence of McReynolds' link to the conspiracy, the parties rested.

The trial court instructed the jury to determine whether McReynolds was guilty of Count 1 and, if so, to determine "the quantity of the controlled substances involved in the conspiracy as a whole that are attributable to the defendant." (Jury Instr., R. 613, Pg. ID 4574.)

Approximately three and a half hours after retiring to deliberate, the jury sent two notes: "Can we please get the reports showing the amount of controlled substances from all the house seizures" and "We would just like the grams of what's seized from the houses, the Michigan State Police report." (Jury Notes, R. 479 (sealed).)  After substantial disagreement about the proper response, the court recalled the jury to hear additional testimony from Special Agent King.

Later, the jury submitted an additional question: "We need clarification on Mr. McReynolds' responsibility for drugs he sold or all the drugs seized in the conspiracy?" (Jury Notes, R. 479 (sealed).)  The court directed the jury to a page of the jury instructions titled "Determining Amount of Controlled Substances." Shortly thereafter, the jury returned a guilty verdict as to Count 1.  It found the amount of controlled substances attributable to McReynolds beyond a reasonable doubt to be "less than 100 grams" of heroin and "less than 500 grams" of cocaine. (Jury Verdict, R. 478, Pg. ID 2532–33.)

Notwithstanding the jury's conclusions, the district court at sentencing attributed much higher drug amounts to McReynolds when calculating his base offense level.  The presentence report ("PSR") attributed 767.66 grams of heroin, 711.56 grams of cocaine, and 263.51 grams of cocaine base to McReynolds in total.  The PSR purported to derive these amounts from two sources.  First, it held McReynolds accountable for "the amounts that were seized during searches and acknowledged in several codefendant[s'] Rule 11 Agreements." (PSR, CA6 Doc. 16-1, ¶ 38.)  It next held McReynolds accountable "for the sale of heroin and cocaine base to AA." (*Id.*)  The PSR multiplied the amount that A.A. usually purchased from McReynolds (*i.e.*, 0.3 grams) by the total number of days of the conspiracy (*i.e.*, 452 days) to attribute to McReynolds an additional 135.6 grams of heroin and an additional 135.6 grams of cocaine base.

Thus, the PSR combined the amounts from the codefendants' plea agreements with the individual sales to A.A. to arrive at the total quantity it attributed to McReynolds: over 750 grams of heroin, over 700 grams of cocaine, and over 250 grams of cocaine base.  In doing so, the PSR increased the low end of McReynolds' advisory guidelines range by approximately five years because the new drug amounts increased his base offense level from 24 (63 to 78

months) to 30 (121 to 151 months). After a two-level firearm enhancement, McReynolds' final base offense level was 32, resulting in a guidelines range of 151 to 181 months of imprisonment.

Accordingly, McReynolds objected to the higher drug attribution amounts at sentencing. He argued that the district court should calculate his base offense level using the amounts indicated by the jury on its special verdict form: less than 100 grams of heroin and less than 500 grams of cocaine, rather than the conspiracy-wide amounts. The district court disagreed. Although it did not explain why it was attributing the conspiracy-wide drug amounts from his codefendants' plea agreements to McReynolds, it stated that it was "satisfied" that those weights should be included in McReynolds' base offense level. (Sent. Hr'g Tr., R. 572, Pg. ID 4100.) After calculating his base offense level using the higher drug amounts, the district court imposed a within-guidelines sentence of 151 months of imprisonment and six years of supervised release. This appeal followed.

## DISCUSSION

### A.

To start, McReynolds challenges his conviction on two related grounds. He argues that his indictment was insufficient for failing to include every element of the charged offense, and he argues that the jury instructions constructively amended the indictment.

We review McReynolds' challenge to the indictment for plain error because he did not raise the issue before the district court. *See, e.g.*, *United States v. Howard*, 947 F.3d 936, 942 (6th Cir. 2020); *accord United States v. Cotton*, 535 U.S. 625, 631 (2002). "An indictment is 'sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy.'" *United States v. Rankin*, 929 F.3d 399, 404–05 (6th Cir. 2019) (footnote omitted) (quoting *Valentine v. Konteh*, 395 F.3d 626, 631 (6th Cir. 2005)). Where the defendant fails to object to the indictment at the district court level, we construe the indictment "liberally in favor of its sufficiency" on appeal. *Howard*, 947 F.3d at 942 (quoting *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999)). Under plain error review, McReynolds must show (1) error, (2) which is clear or obvious, rather than subject to reasonable dispute, (3) which has affected his substantial rights,

and (4) which seriously impugns the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 943; *accord United States v. Marcus*, 560 U.S. 258, 262 (2010).

McReynolds has failed to show any clear and obvious error in the indictment. "[A] conviction under § 846 requires an agreement to violate the drug laws, the defendant's knowledge of the agreement, and the defendant's decision to voluntarily join (or 'participate in') it." *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019). The indictment provided that McReynolds and his codefendants had "knowingly conspired and agreed together . . . to possess with intent to distribute and to distribute controlled substances," in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Indictment, R. 183, Pg. ID 973–74.) McReynolds argues that this language fails to allege that he "knowingly and intentionally agreed to join the conspiratorial agreement to violate the drug laws." (Appellant's Br. at 33–34.) However, contrary to McReynolds' assertion, the indictment includes the essential elements of the offense because it required the government to prove that McReynolds had "knowingly conspired and agreed" with the other coconspirators to possess and to distribute controlled substances. Thus, the government was required to prove (1) an agreement to violate the drug laws, (2) McReynolds' knowledge of this agreement, and (3) that McReynolds knowingly joined this agreement. Construing the indictment in favor of its sufficiency, it accurately reflects the essential elements of the offense. *See Potter*, 927 F.3d at 453. And the indictment gave McReynolds fair notice of the charges against him by citing both 21 U.S.C. §§ 841(a) and 846. *See Williams v. Haviland*, 467 F.3d 527, 535–36 (6th Cir. 2006). Therefore, the indictment was constitutionally sufficient.

Moreover, McReynolds has not demonstrated that the alleged error affected the outcome of his trial, as he is required to show on plain error review. At trial, McReynolds conceded that he sold drugs, but argued that he did not sell drugs as a member of the charged conspiracy. This theory was meant to rebut the precise element that McReynolds now argues was missing from the indictment—that he intended to conspire. Therefore, McReynolds has failed to show that any error in the indictment violated his substantial rights. *See Marcus*, 560 U.S. at 262–65.

McReynolds' argument that the jury instructions constructively amended the indictment is likewise unavailing because it is premised on the same reasoning rejected above. "The Fifth Amendment guarantees that an accused be tried only on those offenses presented in an

indictment and returned by a grand jury." *United States v. Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002). A constructive amendment occurs "when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Siemaszko*, 612 F.3d 450, 469–70 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008)). McReynolds argues that the jury instructions constructively amended the indictment because the instructions asked the jury to determine, in part, whether McReynolds "knowingly and voluntarily joined" the conspiracy (Jury Inst., R. 613, Pg. ID 4569–70), while the indictment did not include this element. Because the indictment sufficiently charged this element of the offense as discussed above, we reject McReynolds' contention that the jury instructions constructively amended it.

For these reasons, we affirm McReynolds' conviction for conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

**B.**

We now turn to McReynolds' sentence. "For defendants convicted of drug crimes, the base offense level at sentencing depends upon the amount of drugs involved in the offense." *United States v. Averill*, 636 F. App'x 312, 315 (6th Cir. 2016) (citing U.S.S.G. § 2D1.1(c)); *accord, e.g.*, *United States v. Gill*, 348 F.3d 147, 149 (6th Cir. 2003). This is because, under the advisory sentencing guidelines, a defendant's base offense level is derived from his or her "relevant conduct," as that term is defined in U.S.S.G. § 1B1.3. Generally, if a sentencing court determines that a defendant's relevant conduct for purposes of sentencing includes drug quantities that are greater than those involved in the offense of conviction, the court may calculate the defendant's base offense level using those higher drug quantities. *See, e.g.*, *Gill*, 348 F.3d at 149 ("A defendant is responsible for all drug quantities that are included within the scope of his 'relevant conduct.'"). "At sentencing, the prosecution bears the burden of proving by a preponderance of the evidence the quantity of drugs involved in an offense." *United States*

*v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010).  We review the district court's factual determination of the quantity of drugs involved in an offense for clear error.  *Id.*

Under this Court's case law, sentencing for drug conspiracy presents a unique set of circumstances.  The advisory guidelines instruct—and this Court has repeatedly held—that the scope of relevant conduct with regard to the drug amounts involved in a conspiracy under § 1B1.3(a)(1)(B) is "significantly narrower" than the conduct needed to obtain a conspiracy conviction.  *United States v. Swiney*, 203 F.3d 397, 402 (6th Cir. 2000); *accord, e.g.*, *United States v. Campbell*, 279 F.3d 392, 399–401 (6th Cir. 2002).  Under § 1B1.3(a)(1)(B), the scope of a defendant's jointly undertaken activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, cmt. n.3(B) (2018).

As the guidelines commentary further explains, "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)."  *Id.*  In other words, the guidelines limit a defendant's vicarious liability for the acts of her coconspirators under *Pinkerton v. United States*, 328 U.S. 640 (1946), by instructing district courts to distinguish between each coconspirator's jointly undertaken activity.  *See, e.g.*, *Campbell*, 279 F.3d at 400–01; *United States v. Harris*, 636 F. App'x 922, 926 (6th Cir. 2016) (citing *Campbell* for the proposition that a sentencing court must "differentiate between co-conspirators varying degrees of culpability"); *see also* Mark Noferi, *Towards Attenuation: A "New" Due Process Limit on Pinkerton Conspiracy Liability*, 33 Am. J. Crim. L. 91, 113–16 (2006).

Thus, "in order to hold a defendant accountable for the acts of others [under § 1B1.3(a)(1)(B)], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant."  *Campbell*, 279 F.3d at 399–400 (alteration in original) (quoting *United States v. Studley*, 47 F.3d 569, 574 (2d Cir. 1995)); *accord, e.g.*, *United States v. Merriweather*, 728 F. App'x 498, 520–22 (6th Cir. 2018); *Harris*, 636 F. App'x at 926; *see also United States v. Kennedy*, 714 F.3d 951, 960–61 (6th Cir. 2013) (applying *Campbell* to sentencing in a mail and wire fraud conspiracy); *United States v. Castilla-Lugo*, 699 F.3d 454, 463–64 (6th Cir. 2012)

(discussing *Campbell* when sentencing for a conspiracy to traffic in fraudulent identification documents). We have explained that this rule "provides adequate protection against the possibility that a less culpable, 'small-time' seller of drugs will be caught up in the sweep of [21 U.S.C. § 841] due to the acts of coconspirators." *United States v. Pruitt*, 156 F.3d 638, 645 (6th Cir. 1998); *see also Campbell*, 279 F.3d at 400 ("Without the requirement that the district court make these two particularized findings, we expose defendants to being sentenced on conspiracies whose activities they did not agree to jointly undertake or could not foresee. Averting sentences based on such conspiracies that are potentially overbroad in scope is one of the specific purposes of § 1B1.3(a)(1)(B).").

In short, our case law instructs that a district court cannot hold a defendant to the entire conspiracy-wide drug amounts at sentencing, which in many cases will be higher than the defendant's actual scope of agreement (and hence, his relevant conduct under § 1B1.3), without any particularized findings as to why it is doing so. But that is exactly what happened here. The district court used the conspiracy-wide drug amounts that were acknowledged in some of McReynolds' codefendants' plea agreements in order to hold McReynolds accountable for those amounts, purportedly under § 1B1.3, thereby increasing the low end of McReynolds' advisory guidelines range by approximately five years. However, the district court did not say why it was holding McReynolds accountable for these higher amounts, even though McReynolds objected to those amounts prior to sentencing. Under these circumstances, we cannot allow McReynolds' sentence to stand. To do so would implicate serious Sixth Amendment concerns, as McReynolds argues.

In *United States v. White*, this Court, sitting en banc, sanctioned the use of judge-found facts that deviate from the jury's verdict when calculating a defendant's advisory guidelines range. 551 F.3d 381, 384–86 (6th Cir. 2008) (en banc). Over the dissent of six judges, a majority of this Court held that a district court does not violate a defendant's constitutional rights when the court relies on so-called "acquitted conduct" to sentence a defendant, so long as that conduct is proven by a preponderance of the evidence. *See id.* at 385. The crux of our reasoning was that jury-found facts and judge-found facts are subject to different burdens of proof. Jury-found facts in support of the conviction must be found beyond a reasonable doubt, while judge-found facts at

sentencing need only be supported by a preponderance of the evidence. *See id.* Thus, the district court in *White* did not sentence the defendant based on "acquitted conduct," but rather applied a different burden of proof to the record evidence in order to determine whether a certain sentencing enhancement should apply. *Id.* This view accorded with that of several other circuits at the time. *See id.* at 383–84 (collecting cases).[1]

The government now argues that *White* forecloses McReynolds' challenge to the drug amounts attributed to him at sentencing. However, the government's argument is misguided. Under *White*, the district court was authorized to disregard the jury's conclusions regarding the drug amounts and to attribute higher drug amounts to McReynolds at sentencing only insofar as those amounts were supported by a preponderance of the evidence. But the district court did not explain why it found those higher drug amounts supported by preponderant evidence in the present case, and upon review of the record, we are not convinced that they were.

To start, as the prosecution's witnesses testified at trial, of the eight search warrants that were executed in the drug bust, none of the searches returned any evidence associated with McReynolds. In addition, law enforcement did not search McReynolds' home and they chose not to wiretap McReynolds' phone. It seems to us that the prosecution's case established only that McReynolds was a dealer, who was "merely purchas[ing] cocaine from other members of the conspiracy for distribution," which he would then sell in half-ounce portions for personal consumption. *United States v. Love*, 392 F. App'x 410, 417 (6th Cir. 2010); *cf., e.g.*, *id.* at 417–18 (distinguishing for purposes of sentencing a drug dealer who purchases drugs from

---

[1]In the past decade since *White* was decided, several justices and judges have repudiated the state of the law on this issue. They have argued that "[t]he Sixth Amendment, together with the Fifth Amendment's Due Process Clause, 'requires that each element of a crime' be either admitted by the defendant, or 'proved to the jury beyond a reasonable doubt,'" and that this constitutional imperative must extend to "any fact necessary to prevent a sentence from being substantively unreasonable—thereby exposing the defendant to the longer sentence." *United States v. Jones*, 135 S. Ct. 8, 8 (2014) (Scalia, J., dissenting from the denial of certiorari) (joined by Thomas and Ginsburg, JJ.) (quoting *Alleyne v. United States*, 570 U.S. 99, 104 (2013)); *see also, e.g.*, *United States v. Saunders*, 826 F.3d 363, 375–78 (7th Cir. 2016) (Manion, J., concurring in part and dissenting in part); *United States v. Canania*, 532 F.3d 764, 776–78 (8th Cir. 2008) (Bright, J., concurring); *United States v. Grier*, 475 F.3d 556, 574 (3d Cir. 2007) (Ambro, J., concurring); *United States v. Henry*, 472 F.3d 910, 919–22 (D.C. Cir. 2007) (Kavanaugh, J., concurring). In accordance with these views, McReynolds argues that we should overrule *White*. However, we cannot do so. *See Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001) ("[W]e are bound by Sixth Circuit precedent unless it is overruled by either our court sitting *en banc* or the Supreme Court."). Nevertheless, we must still review whether the district court correctly applied *White* in this instance in order to ensure that McReynolds' sentence is not unconstitutional.

other coconspirators from one who supports the conspiracy by providing recruitment and logistical support); U.S.S.G. § 1B1.3, cmt. n.4(C)(vi) (distinguishing for purposes of sentencing street-level drug dealers who share a common source of supply from street-level dealers who pool resources and profits).

The jury's verdict reflects a similar conclusion. And yet, the district court attributed the conspiracy-wide drug amounts to McReynolds in calculating his base offense level without providing any explanation as to why it disagreed with the jury. Such hidden judicial fact-finding contravenes *White*'s holding that all facts used against a defendant at sentencing must be supported by a preponderance of the evidence, and implicates serious constitutional concerns under the Fifth and Sixth Amendments. *See White*, 551 F.3d at 385; *cf. United States v. Layne*, 324 F.3d 464, 472 (6th Cir. 2003) ("Generally, due process requires that courts find the presence of a sentencing factor by a preponderance of the evidence." (citing *McMillan v. Pennsylvania*, 477 U.S. 79, 91–92 (1986))); *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006) (holding that "judicial fact-finding in sentencing proceedings using a preponderance of the evidence standard post-*Booker* does not violate either Fifth Amendment due process rights, or the Sixth Amendment right to trial by jury").

Contrary to the government's suggestion, *White* is not a greenlight for the district court to do whatever it wants at sentencing regardless of the jury's verdict and without explanation.**[2]** *White* authorizes a district court to deviate from jury-found facts and to sentence a defendant based on judge-found facts only when those facts are supported by a preponderance of reliable evidence. *See White*, 551 F.3d at 385. As we explained in *White*, "[t]o say that district court judges may enhance a defendant's sentence based on acquitted conduct, however, is not to say that they *must* do so. First, and most obviously, a factual presentation that fails to persuade a jury beyond a reasonable doubt may well fail to persuade a judge by a preponderance of the evidence." *Id.* at 386. Thus, we must be especially careful when reviewing a district court's determination that a sentencing fact was proven by a preponderance of the evidence in cases in which a jury has found that the prosecution failed to establish that fact beyond a reasonable

---

**[2]**The government makes "such a sweeping claim" by asking us to uphold McReynolds' sentence on the record before us. (Dissent at 23.)

doubt. Otherwise, our sentencing regime would create "a shadow criminal code under which, for certain suspected offenses, a defendant receives few of the trial protections mandated by the Constitution." *Grier*, 475 F.3d at 574 (Ambro, J., concurring).

In the present case, we do not know why the judge chose to thread the needle in this way and attribute the conspiracy-wide drug amounts to McReynolds. At best, the district court simply failed to explain its reasoning. At worst, there was not a preponderance of the evidence linking McReynolds to the at-issue amounts and he would be in custody an additional five years in violation of the Constitution if we were to allow his sentence to stand. Either way, we cannot determine from the present state of the record whether McReynolds' sentence is constitutional and whether it complies with this Court's holding in *White*.

Moreover, this holding does not in any way create what the dissent calls an "end-run" around our decision in *White*. (Dissent at 23 n.1.) If the higher drug quantities (i.e., the acquitted conduct) were not proven by a preponderance of the evidence—and on this record we cannot tell whether they were—then McReynolds' sentence would be unconstitutional and substantively unreasonable. The sentence would be too long for his offense of conviction, which includes only the lesser drug amounts, and that is the essence of a substantive reasonableness mistake. *See United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) ("A claim that a sentence is substantively unreasonable is a claim that a sentence is too long (if a defendant appeals) or too short (if the government appeals)."); *see also Jones*, 135 S. Ct. at 8–9 (Scalia, J., dissenting from the denial of certiorari) (joined by Thomas and Ginsburg, JJ.). What the dissent overlooks is that a sentence can be both procedurally unreasonable for failure to explain and substantively unreasonable because it is too long for the offense of conviction. In these ways, the district court's error in this case implicates procedural, substantive, and constitutional concerns.

On the other hand, if the higher drug quantities were proven by a preponderance of the evidence, the district court would have complied with *White*. McReynolds' sentence would not be substantively unreasonable or unconstitutional, and we would uphold that sentence on appeal. But that is not the case here, or in any event, we cannot tell from this record whether it is. Therefore, we must remand with instructions that the district court should adequately explain its

reasoning if it attributes any drug amounts to McReynolds beyond the jury's verdict when calculating his base offense level.

**C.**

The dissent says that we are violating the party presentation principle in so holding. This is incorrect for two main reasons. First, these grounds for reversal were fairly presented by the parties—both in the district court and on appeal. Second, even if the dissent was correct that the parties did not argue this issue, we can and should still reverse the district court in order to prevent the injustice that would otherwise result.

The issue in this case is whether the district court improperly attributed the higher drug amounts to McReynolds at sentencing. On appeal, McReynolds' appellate counsel (perhaps inadvisably) focuses his argument on all of the reasons we should overrule *White*, the case that permits the district court to depart from the jury's verdict and find the higher drug amounts by a preponderance of the evidence. But he also argues that the district court's attribution of the higher drug amounts to McReynolds at sentencing rendered his sentence substantively unreasonable and unconstitutional as applied.[3] (*See* Appellant's Br. at 53–55.) In response, the government argues that "McReynolds's sentencing challenge is foreclosed by this Court's en banc decision in *White*" because the district court found that the higher drug amounts were attributable to McReynolds by a preponderance of the evidence. (*See* Appellee's Br. at 20–23.) Contrary to the dissent's approach, we do not need to be so strict as to interpret McReynolds' focus on appeal on why we should overrule *White* as a forfeiture of his argument that the district court improperly followed *White* in this instance. We all agree that this panel cannot overrule *White*. *See, e.g.*, *Little*, 265 F.3d at 362. But only through the most stringent reading of the parties' briefing could we construe McReynolds' argument as a waiver of his right to be sentenced based on facts proven by a preponderance of the evidence under *White*.

---

[3]McReynolds states the issue presented as: "The use of acquitted conduct to enhance Defendant's sentence by amounts of controlled substances above the jury's special verdict violated Defendant's Sixth Amendment rights and made his sentence substantively unreasonable." (Appellant's Br. at 2.) Thus, we must reject the dissent's suggestion that McReynolds somehow forfeited this argument pursuant to Federal Rule of Appellate Procedure 28, which provides that an appellant's brief "must contain, under appropriate headings . . . a statement of the issues presented for review." Fed. R. App. P. 28(a)(5); *see also United States v. Calvetti*, 836 F.3d 654, 664 (6th Cir. 2016).

That this issue is a necessary part and parcel of the parties' arguments on appeal is underscored by their arguments in the district court. Prior to sentencing, McReynolds objected to the higher drug amounts that were attributed to him in the initial PSR. He argued that the district court should use the drug amounts determined by the jury (less than 100 grams of heroin and less than 500 grams of cocaine) in calculating his base offense level. In response, the government argued that the higher drug quantities "were proven at trial by a preponderance of the evidence, and therefore attributable to the defendant for sentencing guideline calculations" pursuant to *White*. (Gov't Sent. Mem., R. 533, Pg. ID 3294.) Indeed, the government's entire sentencing memorandum focused almost exclusively on why, in its view, the higher drug quantities were supported by a preponderance of the evidence. (*See id.* at 3294–3303.)

In response to McReynolds' objections, the Probation Office adopted the government's position that the higher drug quantities were established by a preponderance of the evidence, and "refer[red] the matter for the Court to decide." (PSR, CA6 Doc. 16-3, A-5.) At the sentencing hearing, the district court acknowledged that it "is authorized by *United States v. White* . . . to make an independent determination as to the weights of the controlled substances by a preponderance of the evidence." (Sent. Hr'g Tr., R. 572, Pg. ID 4099.) It then stated that it was "satisfied" that the amounts from the codefendants' plea agreements and search warrants should be used to calculate McReynolds' base offense level, but again without making any findings as to why those amounts were attributable to McReynolds.[4] (*Id.* at Pg. ID 4100.)

For these reasons, the present case is readily distinguishable from *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020), the primary case on which the dissent relies. In *Sineneng-Smith*, the defendant had never argued that the at-issue statute was facially unconstitutional due to overbreadth. *See id.* at 1578. Nevertheless, the Ninth Circuit "named three *amici* and invited them to brief and argue issues framed by the panel, including a question Sineneng-Smith herself never raised earlier: '[W]hether the statute of conviction is

---

[4]To the extent that the district court relied on McReynolds' codefendants' plea agreements that were not before the jury in order to determine the drug quantities for McReynolds' sentencing, (*see* PSR, CA6 Doc. 16-1, ¶ 38), it may have been error for it to do so. *See United States v. Vera*, 893 F.3d 689, 695 (9th Cir. 2018) (holding that the district court abused its discretion in relying on the codefendants' uncorroborated plea agreements to determine the defendant's drug quantities at sentencing). However, we do not need to decide this question now because it is not necessary to our resolution of the appeal.

overbroad . . . under the First Amendment.'" *Id.* (alterations in original) (citation omitted). The Ninth Circuit then reversed the defendant's convictions on overbreadth grounds and invalidated an entire federal statute even though the defendant's counsel "had presented a contrary theory of the case in the District Court." *Id.* at 1581. The Supreme Court held that the Ninth Circuit's takeover of the case was such a "radical transformation of this case" that it went "well beyond the pale" and constituted an abuse of discretion. *Id.* at 1582; *see also id.* (distinguishing the case from other cases in which "the parties had raised the relevant constitutional challenge in lower courts; the question was not interjected into the case for the first time by an appellate forum").

In contrast, in the present case, the issue is and has always been whether the district court properly attributed the higher drug amounts to McReynolds when calculating his base offense level. McReynolds, the government, the Probation Office, and the district court have all spoken to whether the higher drug quantities were supported by a preponderance of the evidence under *White*, recognizing that this is what the Constitution requires. (*See, e.g.*, PSR, CA6 Doc. 16-3, A-5, A-7; Gov't Sent. Mem., R. 533, Pg. ID 3294–3303; Sent. Hr'g Tr., R. 572, Pg. ID 4099–4100.) Under such circumstances, we decline the dissent's invitation to turn inartful briefing into waiver.

But more importantly, even if the dissent is correct that McReynolds somehow failed to make this argument on appeal, this Court "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see, e.g.*, *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (holding that "a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief" (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990))); *Sineneng-Smith*, 140 S. Ct. at 1579, 1581 (stating that the "party presentation principle is supple, not ironclad" and "a court is not hidebound by the precise arguments of counsel"); *accord, e.g.*, *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013); *United States v. Berry*, 618 F.3d 13, 17 (D.C. Cir. 2010); *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010); *United States v. Moyer*, 282 F.3d 1311, 1317–18 (10th Cir. 2002). And despite the dissent's suggestion to the contrary, this is an appropriate case for exercising that

discretion because allowing the district court's decision to stand would seriously undermine the integrity and perceived fairness of our judicial system.

As explained above, the jury found that McReynolds was guilty for conspiring to distribute less than 100 grams of heroin and less than 500 grams of cocaine.  Nevertheless and based on the same evidence that was presented to the jury, the district court calculated McReynolds' base offense level using its own amounts (over 750 grams of heroin, over 700 grams of cocaine, and over 250 grams of cocaine base) *without explaining its reasons for doing so*, and thereby increased McReynolds' sentence by five years.  Such hidden judicial fact-finding has devastating consequences for the actual and perceived fairness of our criminal justice system.  *See, e.g.*, *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1910 (2018) ("[R]egardless of its ultimate reasonableness, a sentence that lacks reliability because of unjust procedures may well undermine public perception of the proceedings.").

Whether framed as a procedural or substantive mistake, the essence of the district court's error is that McReynolds will spend an additional five years in prison based on the use of drug amounts that were rejected by the jury and not adequately explained by the court in calculating his base offense level.  We do not take lightly the prospect of causing a person to wrongly spend an additional five years in prison.  *See id.* at 1907 ("'To a prisoner,' this prospect of additional 'time behind bars is not some theoretical or mathematical concept.' . . . '[A]ny amount of actual jail time' is significant, . . . and 'ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration.'" (alterations in original) (internal citations omitted)).

Moreover, it was *the government*'s burden at sentencing to establish the quantity of drugs involved in the offense by a preponderance of evidence.  *See, e.g.*, *Russell*, 595 F.3d at 646.  No principle of party presentation requires us to abdicate our role in reviewing whether the district court correctly found that the government had satisfied that burden—especially where the district court did not provide a single reason why it so held.  The district court's error is plain, it affects McReynolds' substantial rights, and it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).  Under such

circumstances, we may choose to right the wrong. *See, e.g.*, *Olano*, 507 U.S. at 736; *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

Lastly, our decision in this case results only in a remand for resentencing for the district court to adequately justify its decision. The Supreme Court has consistently explained that remands for resentencing are "relatively inexpensive" proceedings, given that "'[a] resentencing is a brief event, normally taking less than a day and requiring the attendance of only the defendant, counsel, and court personnel.'" *Rosales-Mireles*, 138 S. Ct. at 1908 (quoting *United States v. Williams*, 399 F.3d 450, 456 (2d Cir. 2005)); *accord Molina-Martinez v. United States*, 136 S. Ct. 1338, 1348–49 (2016); *see also United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 (10th Cir. 2014) ("A remand for resentencing, after all, doesn't require that a defendant be released or retried but simply allows the district court to exercise its authority to impose a legally permissible sentence."). In this way, too, this case is distinguishable from the cases on which the dissent relies. *Cf. Sineneng-Smith*, 140 S. Ct. at 1578 (holding that the Ninth Circuit violated the party-presentation principle where it reversed the defendant's convictions and "invalidated a federal statute" on its own initiative); *Citizens Coal Council v. U.S. E.P.A.*, 447 F.3d 879, 905 (6th Cir. 2006) (en banc) (vacating the panel's decision where it had invalidated an administrative agency's final rule "on grounds not raised by the parties" and "in the context of the deferential *Chevron* analysis").

In sum, because the parties had notice of the issue, the district court ruled on it, our review serves the interests of justice, and a remand for resentencing is a relatively inexpensive remedy for the district court's error, we decline to adopt the judicial blinders favored by the dissent.

**CONCLUSION**

For the reasons given above, we **AFFIRM** McReynolds' conviction for conspiring to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. We **VACATE** his sentence and **REMAND** for resentencing, with instructions that the district court adequately explain its attribution of any drug amounts to McReynolds if the district court deviates from the jury's verdict when calculating McReynolds' base offense level.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

Defendant Calvin McReynolds raises three issues on appeal: (1) whether the indictment failed to state an offense; (2) whether the jury instructions constructively amended the indictment; and (3) whether "the use of acquitted conduct to enhance [his] sentence . . . violated [his] Sixth Amendment rights and made his sentence substantively unreasonable." I agree with my colleagues that the first two issues are meritless and join that portion of the majority opinion affirming defendant's conviction. However, I disagree regarding the third issue and thus respectfully dissent from the remainder of the court's opinion.

Defendant's third issue is a sentencing challenge that we have addressed and rejected en banc. He claims that "[b]y including drug quantities for which [he] had been acquitted, the sentencing court in fact sentenced [him] for an offense not found by the jury and specifically rejected by the jury." And derivatively, he contends that the use of judge-found facts resulted in a substantively unreasonable sentence—*i.e.*, the sentence imposed upon him was longer than necessary. Although defendant acknowledges circuit precedent forecloses this argument, *see United States v. White*, 551 F.3d 381 (6th Cir. 2008) (en banc), he urges us to "set a new bright-line rule: acquitted conduct cannot be used at sentencing." We cannot do so; *White* is binding on this panel until overruled by the Supreme Court or the en banc court. *See Little v. BP Expl. & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001); *see also* 6th Cir. R. 32.1(b).

Nothing more should be needed to resolve this issue. However, the majority goes beyond the questions presented by the parties and invalidates defendant's sentence on grounds that the district court inadequately explained how a preponderance of the evidence supported its decision to hold him responsible for the drug quantities attributed to the conspiracy when calculating his Guidelines range. In my view, this is contrary to the party-presentation principle and constitutes an abuse of discretion. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578 (2020).

In its unanimous decision *Sineneng-Smith*, the Supreme Court admonished us that "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *Id.* That means "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). In other words, we do not "sit as self-directed boards of legal inquiry and research." *Koprowski v. Baker*, 822 F.3d 248, 258 (6th Cir. 2016) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). And we "do not, or should not, sally forth each day looking for wrongs to right." *Sineneng-Smith*, 140 S. Ct. at 1579 (citation omitted). Instead, we "wait for cases to come to [us], and when [they do, we] *normally decide only questions presented by the parties*." *Id.* (citation omitted and emphasis added).

In this regard, *Sineneng-Smith* was not breaking new ground in its reliance on the party-presentation principle. *See, e.g.*, *Wood v. Milyard*, 566 U.S. 463, 472 (2012) ("[A] federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system."); *Greenlaw*, 554 U.S. at 243 ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation."). Thus, we have routinely recognized the limits on our power to resolve issues not properly raised on appeal. *See, e.g.*, *Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 490 (6th Cir. 2014) ("Central Ohio did not raise this issue in its briefs, and accordingly it has forfeited the argument."); *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) (declining to consider issue not presented in appellant's opening brief); *see also Hartmann v. Prudential Ins. Co.*, 9 F.3d 1207, 1214 (7th Cir. 1993) ("Our system . . . is not geared to having judges take over the function of lawyers, even when the result would be to rescue clients from their lawyers' mistakes.").

We should adhere to the party-presentation principle because "our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Sineneng-Smith*, 140 S. Ct. at 1579 (brackets and internal quotation marks omitted). Acting to the contrary deprives the parties of "the opportunity to present whatever legal arguments [they] may have" on

the matter, *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), and increases the chances that we may decide an issue erroneously, *see Elonis v. United States*, 135 S. Ct. 2001, 2013 (2015).

To be sure, the party-presentation principle is "not ironclad," *Sineneng-Smith*, 140 S. Ct. at 1579, and on rare occasion, we relax it in "exceptional cases" where "the failure to do so would constitute a miscarriage of justice[.]" *Dorris v. Absher*, 179 F.3d 420, 425 (6th Cir. 1999). However, this deviation is not taken lightly; it is a "very high bar" to overcome our presumption against reviewing issues that are not raised on appeal. *Id.* Thus, while courts are "not hidebound by the precise arguments of counsel," *Sineneng-Smith*, 140 S. Ct. at 1581, the Supreme Court has advised that we are to reserve this extraordinary use of the judicial power to protect the rights of *pro se* litigants. *See id.* at 1579 ("In criminal cases, departures from the party presentation principle have usually occurred to protect a *pro se* litigant's rights." (internal quotation marks and citation omitted)). And we have gone so far as to vacate panel opinions en banc for reaching beyond the issues presented. *See Citizens Coal Council v. U.S. E.P.A.*, 447 F.3d 879, 905 (6th Cir. 2006) (en banc) ("In short, the panel majority erred in ruling on grounds not raised by the parties. . . . We granted en banc review . . . to vacate the panel majority's sua sponte determination of those unbriefed issues.").

*Sineneng-Smith* illustrates these points well. There, a counseled criminal defendant was charged with encouraging or inducing aliens to come to the United States in violation of our immigration laws. *Sineneng-Smith*, 140 S. Ct. at 1577–78. The defendant argued in the district court that her conduct did not violate the applicable statute as a matter of law, and in the alternative, that the statute conflicted with the Petition and Free Speech Clauses of the First Amendment, rendering it unconstitutional as applied to her. *Id.* at 1578. The district court disagreed, and Sineneng-Smith was subsequently convicted. *Id.*

She then pressed the same arguments to the Ninth Circuit. *Id.* But rather than decide the appeal on the grounds the defendant presented, the appellate court named *amici curiae* and invited them to brief three questions posed by the panel, including whether the statute of conviction was unconstitutionally overbroad. *Id.* Counsel for the parties were then assigned a "secondary role," while the *amici* staked out positions of their own. *Id*. Ultimately, the Ninth

Circuit concluded that the statute at issue was unconstitutionally overbroad, largely following one of the *amici*'s reasoning. *Id.*

In vacating that opinion, the Supreme Court held the Ninth Circuit's decision to address and decide a different issue "departed so drastically from the principle of party presentation as to constitute an abuse of discretion." *Id.* Additionally, the Court held that "[n]o extraordinary circumstances justified the panel's takeover of the appeal," as required to justify relaxing this principle. *Id.* at 1581. Thus, the Court "remand[ed] the case for reconsideration shorn of the overbreadth inquiry injected by the appellate panel and bearing a fair resemblance to the case as shaped by the parties." *Id.* at 1582.

Because my colleagues mischaracterize the arguments before us to avoid acknowledging that they have ventured beyond the issues addressed by the parties, the majority's opinion is *less* defensible than the Ninth Circuit's now-vacated opinion in *Sineneng-Smith*. Where the Ninth Circuit was candid in its desire to resolve a question not presented, my colleagues have chosen instead to obfuscate, deploying judicial sleight-of-hand to decide an unargued issue in defendant's favor. In particular, the majority opinion takes the government to task for "suggest[ing] *White* is . . . a greenlight for the district court to do whatever it wants at sentencing regardless of the jury's verdict and without explanation." But the government never made such a sweeping claim; it stated only that our decision in W*hite* foreclosed McReynolds's request for "a new bright-line rule" that acquitted conduct may not be used at sentencing. The majority agrees that this is correct.[1]

The government was not compelled to do anything further regarding McReynolds's sentencing argument. It certainly could not have predicted a need to defend the district court's *factual finding* regarding the drug quantities used to calculate McReynolds's Guidelines range, when it had never been raised by defendant on appeal. As we explained in *United States v. Calvetti*, arguments not listed in the statement of issues are forfeited:

---

[1]Additionally, McReynolds suggests that his sentence is substantively unreasonable solely "because it is predicated on judge-found 'facts' specifically rejected by the jury verdict." In other words, he argues that a sentence is *always* substantively unreasonable when the district court incorporates acquitted conduct into a defendant's Guidelines range. But as the majority recognizes, that would be an end-run around *White*.

> Under Federal Rule of Appellate Procedure 28(a)(5), "[t]he appellant's brief *must* contain, under appropriate headings and in the order indicated: . . . a statement of the issues presented for review[.]"  Fed. R. App. P. 28(a)(5) (emphasis added). Accordingly, we may dismiss this suppression challenge as forfeited.  *See, e.g.*, *United States v. Honeycutt*, 816 F.3d 362, 370 (6th Cir. 2016) (argument not listed in statement of issues can be deemed waived); *Barrett v. Detroit Heading, LLC*, 311 F. App'x 779, 796 (6th Cir. 2009) (holding that "[t]he provisions of Rule 28(a) are . . . unambiguously mandatory," and waiving an argument not listed in the statement of issues presented).

836 F.3d 654, 664 (6th Cir. 2016).

And thus, by sua sponte addressing this forfeited issue regarding the procedural reasonableness of the district court's drug-quantity finding, the majority has deprived the parties of a chance to participate in the decisional process.  *See Singleton*, 428 U.S. at 120.  Contrast this with the Ninth Circuit allowing the parties to submit supplemental briefs on the questions it raised.  Yet doing so was error in *Sineneng-Smith*.  In my view, the majority's decision here is more violative of the party-presentation principle than the Ninth Circuit's approach.

Additionally, the degree of difference in the issues was much smaller in *Sineneng-Smith* than it is here.  Recall that the question presented to the Ninth Circuit was whether an immigration statute conflicted with the Petition and Free Speech Clauses of the First Amendment as applied to the defendant, whereas the Ninth Circuit decided that the same provision was overbroad in violation of the First Amendment.  The Supreme Court held that it was an abuse of discretion to consider the second issue.  *Sineneng-Smith*, 140 S. Ct. at 1578.  By contrast, McReynolds presented us with a constitutional argument for the *general* prohibition of the use of acquitted conduct in sentencing decisions, but the majority has reframed it as a procedural reasonableness challenge to a *specific* factual finding made by the district court at sentencing. Thus, even if we are not "hidebound by the precise arguments of counsel," the majority's "radical transformation of this case goes well beyond the pale"—transmuting defendant's meritless constitutional claim (which would be applicable to all defendants' sentences) into a supposedly meritorious challenge to the procedural reasonableness of his individual sentence. *Id.* at 1581–82.

Finally, to the extent the majority opinion claims an exception to the general party-presentation rule applies here, it is mistaken. Just as the Supreme Court held in *Sineneng-Smith*, no extraordinary circumstances justify the majority's "takeover of the appeal." *Id.* at 1581. In short, McReynolds made a tactical decision—with the advice of counsel—to challenge the validity of *White*, rather than using it as a sword to seek review of his sentence. Indeed, most of his sentencing argument was devoted to the proposition that new developments in the law should lead us to revisit our holding in *White* that acquitted conduct may be used at sentencing. This "perhaps inadvisabl[e]" strategy," Maj. Op. at 14, which the majority later dismisses as merely "inartful briefing," might form the basis of a meritorious ineffective assistance of counsel claim down the road, but it is insufficient to warrant a departure from the party-presentation principle. *Sineneng-Smith*, 140 S. Ct. at 1579 ("[O]ur system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.").

In sum, my colleagues have cast aside our responsibility to act as the "arbiter[] of legal questions presented and argued by the parties." *Carducci*, 714 F.2d at 177. In their eyes, adhering to this—the cornerstone of our adversarial system of justice—amounts to "adopt[ing] judicial blinders." Thus, they vacate McReynolds's sentence because of their concerns—apparently not shared by defendant—over whether preponderant evidence existed to hold him responsible for drug quantities primarily attributable to his co-conspirators. Supreme Court precedent holds this departure from the party-presentation principle is an abuse of discretion.

Because we are not advocates, but rather impartial judges who should normally decide only issues that are preserved, raised, and argued on appeal, I would affirm defendant's conviction and sentence. Therefore, I respectfully concur in part and dissent in part.